IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| BARBARIETTA TURNER-PUGH, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   CIV. ACT. NO. 1:23-cv-294-TFM-N |
| | ) |
| MONROE COUNTY BOARD | ) |
| OF EDUCATION, *et al.*, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is the Motion for Summary Judgment (Doc. 89, filed July 16, 2025) in which Defendants Monroe County Board of Education ("MCBOE") and Gregory Shehan ("Shehan") petition the Court to enter summary judgment in their favor and against Plaintiff Lizzie Ingram ("Ingram" or "Plaintiff") for her three Federal claims against the MCBOE – Title VII discrimination and retaliation, a violation of the Equal Pay Act ("EPA"), and two State law claims – defamation of character and breach of contract. Doc. 80 at 13-20. Having considered the motion for summary judgment, response, reply, and relevant law, the Court finds the motion is due to be **GRANTED**.

I.   **JURISDICTION AND VENUE**

The Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 (federal question). The Court has personal jurisdiction over the claims in this action because the events that gave rise to this action occurred within this district. *See Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291-92 (11th Cir. 2000) ("Specific jurisdiction arises out of a party's activities in the forum that are related to the cause of action alleged in the complaint .... General personal jurisdiction, on the other hand, arises from a defendant's contacts with the forum

that are unrelated to the cause of action being litigated. The due process requirements for general personal jurisdiction are more stringent than for specific personal jurisdiction, and require a showing of continuous and systematic general business contacts between the defendant and the forum state."). Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to the claims in this matter occurred in this judicial district.

No party disputes or debates the Court's jurisdiction or venue, and the Court finds adequate support for both.

## II. BACKGROUND[1]

Ingram was hired as the Chief School Finance Officer ("CSFO") by MCBOE in 2018. Docs. 90 at 11; 104 at 2. On March 10, 2020, Ingram signed an employment contract with MCBOE for the CSFO which ran through March 10, 2023. Doc. 90 at 14; 104 at 3. MCBOE paid for Ingram's training for her CSFO certification which she received in February 2023. Doc. 91-1 at 6.

In October 2022, MCBOE was considering a pay raise for Shehan, and Ingram informed MCBOE that there were insufficient funds for such a raise. Doc. 104 at 2. Around that same time, co-plaintiff Turner-Pugh "had a contentious conversation with Shehan, after which Ingram spoke in support of Turner-Pugh to Shehan." *Id.* Specifically, Ingram testified that "I went to him and told him to listen to her, what she said and not the tone that she actually used." Doc. 99 at 613.

---

[1] At this stage of the proceedings, the court takes the facts alleged by Ingram as true and construes them in the light most favorable to her. *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir.2000) (citations omitted) ("In assessing whether there is any 'genuine issue' for trial, the court 'must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party,' " ... and 'resolve all reasonable doubts about the facts in favor of the non-movant.' ... "Moreover, the court must avoid weighing conflicting evidence or making credibility determinations...."). Thus, the facts set forth herein are drafted assuming the allegations presented by Ingram are true.

On January 19, 2023, MCBOE informed Ingram in writing that he was being placed on "detached duty" with full pay and benefits through the end of her contract on March 1, 2023. Doc. 99 at 621. In the notice, MCBOE stated "Please remember that the Board has directed that you pay back the sum of $14,760 which you paid yourself without Board approval." *Id.* It is MCBOE's contention that "From October 2021 to September 2022, Ingram improperly paid herself $14,760, by raising her monthly gross salary by $1,230 for 12 months, which was not Board approved." Doc. 90 at 13; *see also* Doc. 91-6 at 1. Ingram denies that she paid herself without approval. Specially, Ingram argues that her pay increase was approved by MCBOE when the board approved a McKinney-Vento grant for a homeless liaison position that Ingram would fill in addition to her CSFO duties. Doc. 99 at 618. MCBOE made a demand on Ingram's surety bond, which the surety paid. Doc. 91-4 at 1. On May 15, 2024, the Alabama Department of Examiners of Public Accountants sent a formal demand letter to Ingram for repayment of the disputed amount and notified her of her hearing rights. Doc. 91-6 at 1.

On November 17, 2022, the Monroe Journal published a news article covering the MCBOE board meeting held the week before. In that article, the writer Mike Qualls reported that "Shehan said Ingram received $14,760 through the McKinney-Vento Act, but the appropriation of funds did not come before the local school board for a vote as it should have, according to State Superintendent of Education Ed Mackey." Doc. 99 at 623. Ingram alleges that Shehan made this statement to Qualls in a private email meant to defame her. Doc. 104 at 3.

Ingram and her co-plaintiffs filed suit on August 1, 2023. Doc. 1. Ingram brought four claims: Federal claims against the MCBOE – Title VII discrimination and retaliation, and a violation of the Equal Pay Act ("EPA"), and two State law claims against Shehan in his individual capacity – defamation of character and breach of contract. Doc. 80 at 13-21. On July 16, 2025, the Defendants filed a motion for summary judgment, arguing that Ingram has failed to show a prima

facie case of her claims and that Shehan is entitled to State Agent Immunity on the defamation claim. The motion has been fully briefed and is ripe for decision. Oral argument is not needed.

### III.    STANDARD OF REVIEW

A party in a lawsuit may move a court to enter summary judgment before trial. Fed. R. Civ. P. 56(a), (b). Summary judgment is appropriate when the moving party establishes there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) ("Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'"). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Ritchey v. S. Nuclear Operating Co.,* 423 F. App'x 955 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248).[2] At the summary judgment juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Only disputes about the material facts will preclude the granting of summary judgment. *Id*.

The movant bears the initial burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party must support its assertion that there is no genuine issue of material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The admissibility of evidence is subject to the same standards and

rules that govern admissibility of evidence at trial. *Clemons v. Dougherty County*, 684 F.2d 1365, 1369 n.5 (11th Cir. 1982) (citing *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 556 (5th Cir. 1980)).

Once the movant meets its burden under Fed. R. Civ. P. 56, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "A genuine issue of material fact exists when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248). The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* (citing *Rosario v. Am. Corrective Counseling Servs., Inc.*, 506 F.3d 1039, 1043 (11th Cir. 2007)); *Greenberg*, 498 F.3d at 1265 ("We view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion."). However, to avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (citations omitted). Conclusory assertions, unsupported by specific facts, that are presented in affidavits opposing the motion for summary judgment are likewise insufficient to defeat a proper motion for summary judgment. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). "Speculation does not create a *genuine* issue of fact." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (citation omitted). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249-50 (emphasis in original) (citations omitted). In short, summary judgment is proper after adequate time for discovery and upon motion against a party who fails to make a showing that is sufficient

to establish the existence of an element that is essential to that party's case. *Celotex*, 477 U.S. at 322.

Finally, Fed. R. Civ. P. 56(e) also provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order." Fed. R. Civ. P. 56(e).

### IV.  DISCUSSION AND ANALYSIS

**A.   Title VII Discrimination/Retaliation**

In the Third Amended Complaint, Ingram alleges that MCBOE violated her rights under Title VII when it terminated her employment in retaliation for statutorily protected expression, i.e., her support of Turner-Pugh, and subjected to allegations of misappropriation of funds. Doc. 80 at 13. MCBOE first "disputes that Ingram can meet her prima facie burden of sex or race discrimination because Ingram cannot show (1) adverse employment action or (2) that the Board treated a similarly situated male or white employee more favorably." Doc. 90 at 16.

"The Board does not dispute that Plaintiff Ingram is an African American female who was qualified to work as its CSFO. Ingram received her CSFO certificate in February 2023 through the AASBO." Doc. 90 at 16. MCBOE first argues that Ingram cannot show an adverse employment action. It is undisputed that MCBOE placed Ingram on "detached duty" on January 19, 2023 after the Board decided to allow Ingram's employment contract to expire by its own terms in March 2023. Docs. 90 at 13-14; 104 at 3.

To establish a prima facie case of either discrimination or retaliation in violation of Title VII, a plaintiff must show she suffered an adverse employment action. *Compare Stavropoulos v. Firestone*, 361 F.3d 610, 616-17 (11th Cir. 2004) (*citing Bass v. Bd. of Cty. Comm'rs*, 256 F.3d 1095, 1117 (11th Cir. 2001)) ("To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action."), *with Rice-Lamar v. City of Ft. Lauderdale*, 232 F.3d 836, 842-43 (11th Cir. 2000) (*citing Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997)) ("[A] plaintiff can establish a prima facie case that she was discriminated against in violation of Title VII by showing: (1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees who are not members of the plaintiff's class more favorably; and (4) she was qualified for the job or job benefit at issue.").

"[T]o prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a serious and material change in the terms, conditions, or privileges of employment." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1240 (11th Cir. 2001) (emphasis in original). "Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id*. (*citing Doe v. Dekalb Cty. Sch. Dist.*, 145 F.3d 1441, 1453 (11th Cir. 1998)). However, "in the context of a Title VII retaliation claim, a materially adverse action 'means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Crawford v. Carroll*, 529 F.3d 961, 970-71 (11th Cir. 2008) (*quoting Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69, 126 S. Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006)).

MCBOE argues that under Alabama state law, "a public school system CSFO has no tenure rights. Ala. Code § 16-24C-4(3)(b). Thus, by allowing Ingram's CSFO term of employment to expire is also not an adverse employment action by the Board." Doc. 90 at 17. However, the Eleventh Circuit has held that a "[s]chool [d]istrict's refusal to renew [an employee's] contract was clearly an adverse employment action…" *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1241 (11th Cir. 2016).

1. **Discrimination**

MCBOE next argues that Ingam has failed to put forward qualified comparators to support her claims of racial and sex discrimination, specifically, "Ingram cannot show that the Board treated a similarly situated male or white employee more favorably than her. Ingram does not identify a comparator. No such comparator exists." Doc. 90 at p. 17. A fellow employee is "similarly situated" when they: (1) "have engaged in the same basic conduct (or misconduct) as the plaintiff"; (2) "have been subject to the same employment policy, guideline, or rule as the plaintiff"; (3) "have been under the jurisdiction of the same supervisor"; and (4) "share the plaintiff's employment or disciplinary history." *Lewis v. City of Union City*, 918 F.3d 1213, 1227–28 (11th Cir. 2019) (en banc).

In her response brief, Ingram offers her predecessor and successor, both white women, as her comparators for her claim of racial discrimination: "Ingram's successor as CSFO was treated more favorably than Ingram while in the same position of employment. In the present case, both Ingram's predecessor and successor were white women." Doc. 104 at 5. In support of this allegation, Ingram first argues that her "replacement in her position as CSFO was less qualified than Ingram when she was awarded the position." *Id.* However, she does not argue that her successor was unqualified or that the difference in their respective qualifications was such that her successor was not a similarly situated comparator. Igram next argues that her successor was provided with more resources

for her on-the-job training. *Id.* Ingram does not deny that her training led to successful completion of her certification program. Ingram does not address whether the additional resources were due to the successor being, as she alleges, less qualified at time of hire. Moreover, review of the record shows that Ingram bases this allegation on having read in the paper that the new trainer was hired through a company called "Criteria, and I know what they pay per day." Doc. 99 at 535-36. Even construing the evidence in the light most favorable to Ingram, Ingram's claim of higher paid trainers for her successor is based on an assumption of what Criteria was charging MCBOE.

Ingram also argues that her contract was allowed to expire "as a result of inaccurate findings that she had paid herself a stipend that was not approved by the Board." Doc. 104 at 6. Ingram therefore argues that she suffered discrimination because "others were provided with stipends that were similarly not Board approved, but were not requested to pay them back; namely, a white woman, and a man." *Id.* The evidence offered by Ingram in support of this argument shows that the two people in question who allegedly were not required to pay back stipends which had not been approved by MCBOE were Paige Hybart (Doc. 99 at 540) and Marty Hanks (*Id.* at 562). Neither Hybart or Hanks were employed as a CSFO nor does Ingram provide any other evidence that would suggest that Hybart or Hanks are similarly situated employees. Accordingly, Ingram has failed to show that MCBOE treated any similarly situated employee more favorably as to race.

As to Ingram's claim of discrimination on the basis of sex, she concedes that "no direct comparator exists to show disparate treatment on the basis of sex in regards to employment expectations…" Doc. 104 at 7. Rather, Ingram argues she has presented a convincing mosaic of circumstantial evidence that raises an inference of intentional sex discrimination by MCBOE.

> Aside from the McDonnell Douglas framework, an employee can still survive summary judgment by presenting "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional

> discrimination by the decisionmaker." *Id*. (internal quotation marks omitted). A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) "systematically better treatment of similarly situated employee," and (3) pretext. *Lewis [v. City of Union City]*, 934 F.3d [1169,] 1185 [(11th Cir. 2019)].

*Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022).

Turning to a mosaic analysis of her sex discrimination claim, Ingram first argues "that Shehan had a 'hard time taking orders from an educated female,' (Doc. 99, PageID. 2617) and that Shehan disliked her and co-plaintiff Dr. Turner-Pugh because they were educated women. (Doc. 99, PageID. 2618)." Doc. 104 at 7. Ingram's Title VII claim is against MCBOE, not Shehan. Doc. 80 at 14. Ingram makes no showing that MCBOE knew of or considered Shehan's interactions with Ingram. Ingram makes reference to Hanks as a comparator without making a showing that he is a similarly situated employee. "The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir.2007) (*citing Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 798–99 (11th Cir.2000)). In this instance, Ingram does not allege that she reported any claim of sex discrimination to MCBOE members. Rather, she was placed on detached duty by MCBOE within a three-month period of when she claims she spoke to Shehan in support of Turner-Pugh. Even construing these facts in the light most favorable to Ingram, there is no convincing mosaic of sex discrimination.

### 2. Retaliation

Ingram argues that she experienced "retaliation for protected speech, in which she asked Shehan to "listen to the content [of Turner-Pugh's statements], not the tone [in which they are delivered]." Doc. 104 at 8. Ingram further asserts that following a November 2022 MCBOE meeting, "Ingram requested Shehan to allow Turner-Pugh to address the Board regarding the

accusations made against her which served as the pretextual basis of her administrative leave (Doc. 99, PageID. 2645-2646), to which Shehan responded that Ingram should 'focus on her own job.'" *Id*. Following that meeting, "Ingram was told that she did not fare well in her evaluation scores." *Id*. Ingram further argues that the scrutiny she received for her pay was in retaliation for speaking out in support of Turner-Pugh.

Even assuming sufficient evidence for a prima facie showing of retaliation due to the proximity of Ingram speaking out in support of Turner-Pugh and the nonrenewal of her contract, Ingram fails to rebut the legitimate, nondiscriminatory reason proffered by MCBOE. MCBOE chose to allow Ingram's contract of employment to terminate because:

> From October 2021 to September 2022, Ingram improperly paid herself $14,760, by raising her monthly gross salary by $1,230 for 12 months, which was not Board approved. The Board must approve all pay. Ingram improperly paid herself a supplement with public funds while she was employed by the Board as the CSFO in charge of all funds of the Board. The Alabama Department of Examiners of Public Accounts flagged these payments as illegal activity. Ingram refused to repay the Board the improperly paid amount causing the Board to assert a surety bond claim against CNA Surety, Ingram's bonding company. CNA ultimately repaid the Board $14,760 after Ingram failed to repay that amount. Ingram's misappropriation of public funds and refusal to correct her inappropriate actions were legitimate and nondiscriminatory reasons for the Board's decision not to extend Ingram's CSFO term of employment.

Doc. 90 at 17-18. "A legitimate nondiscriminatory reason proffered by the employer is not a pretext for prohibited conduct unless it is shown that the reason was false and that the real reason was impermissible retaliation or discrimination." *Worley v. City of Lilburn,* 408 Fed. Appx. 248, 251 (11th Cir.2011) (unpublished) (citing *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). Plaintiff cannot merely "recast an employer's proffered nondiscriminatory reasons or substitute [her] business judgment for that of the employer" but rather "must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transport,* 229 F.3d 1012, 1030 (11th

Cir.2000). Conclusory allegations or unsupported assertions, without more, "are not sufficient to raise an inference of pretext." *Mayfield v. Patterson Pump Co.,* 101 F.3d 1371, 1376 (11th Cir.1996) (citations omitted); *see also Worley,* 408 Fed. Appx. at 251 (quoting *Mayfield* ).

Ingram's argument that the termination was pretextual is as follows: "Shehan grew disdainful of Ingram and sought an adequate pretext to have her terminated." *Id. See also id.* at 8 ("Following that meeting, Ingram requested Shehan to allow Turner-Pugh to address the Board regarding the accusations made against her which served as the pretextual basis of her administrative leave, to which Shehan responded that Ingram should 'focus on her own job.'")(citation omitted). However, Ingram does nothing to rebut MCBOE's reason for the termination. Thus, the retaliation claim for termination fails also. Defendants' motion for summary judgment is due to be granted as to Ingram's claims of discrimination and retaliation under Title VII.

**B.     Defamation**

Ingram argues that "Defendant GREG SHEHAN, was responsible for disseminating false and defamatory statements about Plaintiff LIZZIE INGRAM, either negligently or with reckless disregard of its truth, alleging the wrongful retention of $14,760.00, an indictable offense, constituting defamation per se." Doc. 80 at 16. Shehan argues that he is entitled to State Agent Immunity as to this claim and that Ingram has failed to satisfy the elements for a state claim of defamation. Doc. 90 at 23-29.

**1.   State Agent Immunity**

Shehan first argues that "Ingram's State law defamation claim against Shehan is barred by State agent immunity as prescribed by *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000)." Doc. 90 at 24. The Eleventh Circuit has held

> To establish a prima facie case of defamation under Alabama law, a plaintiff must show (1) "that the defendant was at least negligent" (2) "in publishing" (3) "a false and defamatory statement to another" (4) "concerning the plaintiff," (5) "which is

> either actionable without having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable per quod)." *Nelson v. Lapeyrouse Grain Corp.*, 534 So. 2d 1085, 1091 (Ala. 1988). When the defamation claim is brought against a state official, whether state-agent immunity exists should be answered before undertaking the prima facie inquiry. *See Gary v. Crouch*, 867 So. 2d 310, 313 (Ala. 2003) (addressing immunity before deciding whether the plaintiff had established a prima facie case).

*Garcia v. Casey*, 75 F.4th 1176, 1191 (11th Cir. 2023).

Ingram argues that "State Agent Immunity is not available to Shehan as to the State claims raised against him, as his acts of defamation were willful, malicious, fraudulent, and in bad faith." Doc. 104 at 12. The Eleventh Circuit has held

> Like qualified immunity, state-agent-immunity doctrine "ha[s] established *1192 a 'burden-shifting' process when a party raises the defense." *Giambrone v. Douglas*, 874 So. 2d 1046, 1052 (Ala. 2003). Under that framework, the defendants "bear the burden of demonstrating that [plaintiffs'] claims arise from a function that would entitle them to immunity." *Id*. "If the [defendants] make such a showing, the burden then shifts to [plaintiffs], who, in order to deny [defendants] immunity from suit, must establish that [defendants] acted willfully, maliciously, fraudulently, in bad faith, or beyond their authority." *Giambrone*, 874 So. 2d at 1052.

*Garcia*, 75 F.4th at 1191–92.

The only evidence offered by Ingram to support her claim that Shehan's comments were "willful, malicious, fraudulent, and in bad faith" is her own deposition testimony. Specifically, Ingram testified that her claim was entirely based on what reporter Mike Qualls wrote in his Monroe Journal article published November 17, 2022. Doc. 99 at 601, 62. The article in question states the following in regard to Ingram:

> Also, Shehan said Ingram received $14,760 through the McKinney-Vento Act, but the appropriation of funds did not come before the local school board for a vote as it should have, according to State Superintendent of Education Ed Mackey.
>
> Shehan said, according to Mackey, the board may choose, by a majority vote, to do one of the following: approve the appropriation of the full amount to Ingram; approve an appropriation of part of the funds to Ingram and have her repay the balance of the funds; or deny the appropriation of any amount to Ingram and have Ingram repay all the funds.

> When asked by Shehan to vote on the three choices, the board voted 4-1 to deny the appropriation of any funds. However, at the urging of Turner, the board agreed to resend the vote and table the matter for further discussion at the Dec. 8 work session. Turner said she felt it isn't fair to ask Ingram to repay all the funds because nobody knew the payment had to be approved by the local board.

Doc. 99 at 623.

Ingram testified that Qualls got the information directly from Shehan via email rather than simply being at the meeting. When asked "How do you know that Mr. Qualls got any information from Mr. Shehan?" she replied, "Because in the past and any time else Greg Shehan after the day of the board meeting, Greg Shehan would e-mail Mike Quall exactly what to print in the Monroe Journal." Doc. 99 at 602. Ingram testified that she believed this to be the case because "I have walked in his office when he was typing, and he said, hold on, let me finish e-mailing Mike Qualls and then I'll get with you." *Id.* at 604. As speculative as this assertion is, viewing the evidence in the light most favorable to Ingram, her contention is that the defamatory remarks allegedly communicated from Shehan to Qualls occurred via an email, and thus would not have arisen from a state-agent function, i.e., speaking at a board meeting in his official capacity. Accordingly, for the purposes of summary judgment review, State Agent Immunity would not apply to Shehan for any publication of defamatory remarks made to Qualls in the email Ingram claims Shehan sent to Qualls after the meeting telling him what to print.

### 2. Elements of Defamation

The Alabama Supreme Court has held that:

> To establish a prima facie case of defamation, the plaintiff must show [1] that the defendant was at least negligent, [2] in publishing [3] a false and defamatory statement to another [4] concerning the plaintiff, [5] which is either actionable without having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable per quod).

> One who publishes a defamatory statement of fact is not subject to liability for defamation if the statement is true. Stated otherwise, truth is a complete and absolute defense to defamation.

*Regional Prime Television v. South*, 399 So. 3d 220, 254 (Ala. 2024)(cleaned up).

Ingram specifically testified that she was not claiming defamation by Qualls or the Monroe Journal and that her claim was limited specifically to the publication of information from Shehan to Qualls. Doc. 99 at 601. There is no copy of the email or evidence that it ever existed, and no other evidence to support Ingram's bare belief that because she had seen Shehan writing one or more emails in the past to Qualls after board meetings, he did so in this instance. At Ingram's deposition, she acknowledged that she does not "have anything in writing or any kind of audio or video recording that would substantiate [her] belief that Mr. Shehan was providing inside information to [Qualls]." Doc. 91-1 at 40. There is no evidence of what was communicated in the email or that the email contained any information not otherwise made public at the board meeting. In short, Ingram has come forward with a claim based on speculation that Shehan sent an email to Qualls. While there is a factual dispute as to whether or not Shehan actually sent an email to Qualls, Ingram cannot rely on that factual dispute to avoid summary judgment because a claim of defamation must be supported by false information provided to a third party. Ingram has not done this. Even construing the evidence in her favor, Ingram has argued the existence of a defamatory email from which no known information has been provided. In the absence of any evidence that the email exists or what it contained, Shehan's motion for summary judgment on Ingram's claim for defamation is due to be granted.

### C. Abandoned Claims

Ingram concedes to dismissal of Count VI – Equal Pay Act and Count IV – breach of contract against MCBOE and Shehan. Doc. 104 at 14, 17. Accordingly, those claims are dismissed with prejudice.

### V. CONCLUSION

Accordingly, the Motion for Summary Judgment (Doc. 89) is **GRANTED**, and Plaintiff Lizzie Ingram's claims that she brings against Defendants Monroe County Board of Education and Gregory Shehan are **DISMISSED with prejudice**.

A separate judgment will issue pursuant to Fed. R. Civ. P. 58.

**DONE** and **ORDERED** this 14th day of January 2026.

_____
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE